Receipt Number
551851



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Tony Marcelli, Cynthia Marcelli,
and Marcelli Construction Company,
Inc., a Michigan corporation,

Case: 2.06-cv-15477
Assigned To: Edmunds, Nancy G
Referral Judge: Majzoub, Mona K
Filed: 12-11-2006 At 03:18 PM
CMP MARCELLI, ET AL V WALKER, ET AL
(TAM)

Plaintiffs,

v.

James M. Walker, individually, and as agent
for Westfield Commpanies, dba,
Ohio Farmer's Insurance Company,
Gus Yogmour, Jr. Ronald A. Deneweth,
 Schier, Deneweth & Parfitt, P.C.
and Parfitt & Deneweth, P.C. and  Clifford Taylor,
Chief Justice of Michigan Supreme Court State of Michigan,
Oakland County Drain Commission, William Klockow, George
Bondi, City of Taylor, Gerald L. Couch, Cameron
Priebe, Yopps & Wilkie & Assoc., Inc., John Wilkie, David Zanley
 Randall Pentiuk, individually and as agent for City of Melvindale,
Eric Witte, Charles Raines and Charles Raines & Assoc., Souheil Sabak,
 City of Lapeer, George Strand, Ronald Shamblin, Ray Trucyn
TMP Associates and Timothy A. Casia, David M. Koziarz
 Henry Ford Community College and Terry Biernet., Terry Stollsteimer
R.V. Buric Construction Management Consultants, Inc. and Gary Mottler,

Defendants.

_____/

## COMPLAINT AND JURY DEMAND

### OVERVIEW

This action to recoup monetary losses is occasioned by the conspiracy of the

several Defendants acting jointly to procure a state court judgment through criminal

2:06-cv-15477-NGE-MKM   Doc # 1   Filed 12/11/06   Pg 2 of 50   Pg ID 39

scheme employing means of fraud and perjury for the unlawful purpose of depriving

Plaintiffs of their property interests in 10 municipal, state and federal construction

projects in violation of the 5th and 14th amendments to the Constitution of the United

States, art. I, §2,17 and Art. X, § 2 of the Michigan Constitution of 1963 and in violation

of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962, ct seq..

  The Marcelli's company, MCCI's  10 owner contracts had been completed,

substantially completed or were owner occupied  and, as such, default by MCCI's

contracts with owners  was both legally and factually impossible. **And no court has**

**found such an actual, material, default to exist.** Likewise, in the absence of  MCCI

default with owners, MCCI could not  default in the terms of its performance and

payment bonds with OFIC.  **No court has ever found that MCCI defaulted in its**

**performance with owner contracts after trial or evidentiary hearing.**

  The OFIC Defendants, a surety for hire, employed financial incentives to

obtain false and fraudulent statements of default and contract termination from complicit

co-defendants, Oakland County Drain Commission, City of Melvindale,  and City of

Lapeer to create false claims against MCCI as obligors under payment and performance

bonds and to create the appearance of claims against the individual Marcelli plaintiffs

upon their personal indemnity agreements. Further, the false declarations of default by

the municipal defendants. In furtherance of their conspiratorial undertaking,

OFIC, Walker, Deneweth and Yogmour .created perjurious affidavits to create the

illusion that Plaintiff, Marcelli Construction Company, Inc. was indebted to Defendant

Ohio Farmer Insurance Company and was insolvent in order to obtain control over

2

Marcelli's 10 contract receivables. Ohio Farmer proceeded to collection of this fraudulently procured judgment causing Plaintiffs' combined losses and damages in an amount in excess of Three Hundred Million ($300,000,000.00) Dollars. Plaintiffs seek treble damages associated with loss of their business and property.

Coincidental with Plaintiffs execution of bonds and an indemnity agreement with Ohio Farmer's Insurance Company, Plaintiffs' executed a power of attorney appointing Ohio Farmer as their attorneys-in-fact to protect MCCI from egregious and malicious conduct of owners and subcontractors. Pursuant to the exercise of its power of attorney, Ohio Farmer through the agency of the several individual agents and attorneys undertook the representation of Plaintiffs' interests and violated the standard of care and duties of undivided loyalty owed by fiduciaries to their clients and principals resulting in great financial loss to Plaintiffs. The OFIC defendants willful and intentional violations of their duties to Plaintiffs aggravated and exacerbated Plaintiffs financial losses.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court pursuant to 18 U.S.C. §1964(c), 42 U.S.C.1983, 1985 and 28 U.S.C.§1331 of the laws of the United States. Plaintiffs are alleging violations of their rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C.§1961, et seq.

2.  Venue is proper under 18 U.S.C.§1965(a) and 28 U.S.C. §1391(b).

## GENERAL ALLEGATIONS

3.      Tony Marcelli is a citizen of the State of Michigan and resides in

3

Bloomfield Hills, Michigan and is located within the district.

    4.     Cynthia Marcelli, is a citizen of the State of Michigan and resides within the district or, more particularly, in Bloomfield Hills, Michigan.

    5.     Marcelli Construction Company, Inc., is a Michigan corporation which maintains its offices within the district and, at all times pertinent to this complaint, was principally engaged in the construction of public projects for municipal, state and federal government entities or agencies.

    6.     Upon information and belief, Plaintiff believes that Defendant Westfield Companies, owns or controls Defendant, Ohio Farmer's Insurance Company and the latter is principally engaged in the business of insurance and bond underwriting.

    7.     Ohio Farmer's Insurance Company is a foreign corporation which maintains its principal offices within the State of Ohio and is authorized to and conducts business as an insurance and bonding company within the State of Michigan.

    8.     Defendant, James M. Walker, is upon information and belief, a lawyer, a certified public accountant and agent for Ohio Farmer Insurance Company and was, at all times pertinent to the allegations of this complaint, both a citizen of the State of Ohio and the criminal mastermind of a shameless, criminal conspiracy and scheme to commit illegal and criminal acts, as described hereinafter, with the objective to appropriate Plaintiffs' business and property for his own purposes.

    9.     Defendant, Gus Yogmour, Jr., is upon information and belief, a lawyer, an engineer and agent for Ohio Farmer's Insurance Company and was, at all times pertinent to the allegations of this complaint, a citizen of the State of Ohio.

4

10.     Defendant , Ronald A. Deneweth, is a citizen of the State of Michigan and
is a licensed attorney engaged in the practice of law, resident within the district, a citizen
of the State of Michigan and acted at all times as agent for co-Defendant Shier, Parfitt
and Deneweth P.C..  Further, upon information and belief, Deneweth joined Walker,
Yogmour and OFIC 's to pursue their criminally conspiratorial objectives against
Plaintiffs through criminal acts, as described hereinafter, including, but not limited to
criminal fraud and knowing use of perjurious affidavits in a court proceeding.

11.     Defendant, Shier, Deneweth and Parfitt, P.C. is a professional corporation
engaged in the practice of law and maintained its offices within the district, at all times
pertinent to the allegations of the complaint.

12.     Defendants classed as conspiring project owners are as follows:

a. Melvindale Defendants.

1)  City of Melvindale is a municipal corporation located within the
district.

2) Randall Pentiuk, is an attorney and citizen of the State of Michigan
who maintains offices and residence within the district.  At all times
pertinent to the allegations of this complaint, Defendant Pentiuk was an
authorized agent for the City of Melvindale.

3)  Eric Witte, was the Commissioner of Water for the City of Melvindale
and is a citizen of the State of Michigan and maintains offices within the
district.

b. The Charles E. Raines Defendants:

5

1) Charles Raines, is an engineer and citizen of the State of Michigan, who resides and maintains offices within the district.

2) Souheil Sabak, is an engineer and citizen of the State of Michigan, who resides and maintains offices within the district.

3) Charles Raines Co., Inc. is a corporation engaged in the providing engineering and design services and is a resident of the State of Michigan and, further, maintains its offices within the district.

c. Lapeer Defendants.

1) City of Lapeer, is a municipal corporation which maintains offices within the district.

2) George Strand, is a citizen of the State of Michigan and resides and maintains offices within the district. At all times pertinent to the allegations of the complaint, Strand acted under color of law in his capacity as an official of the City of Lapeer.

3) Ronald Shamblin, is an attorney and citizen of the State of Michigan, who maintains his offices and residence within the district. At all times pertinent to the allegations of the complaint, Shamblin acted under color of law as authorized agent for the City of Lapeer.

4) Ray Turczyn is a citizen of the State of Michigan and both resides and maintains offices within the district and acted under color of law as director of City of Lapeer Community Center at all

6

times pertinent to the allegations of the complaint.

d.   The TMP Defendants.

> 1) TMP Associates, Inc., is a corporation which is a citizen of the State of Michigan, maintains its offices within the district and is engaged in the architecture profession and committed and attempted to cover up its design malpractice through falsification and false allegations of contractor breach.
>
> 2) Timothy A. Casai, is a citizen of the State of Michigan and acted as vice-president and authorized agent for TMP Associates, Inc. and conspired and acted to knowingly and intentionally cover up TMP's design malpractice through a scheme of lies and deception with intention of shifting financial responsibility to MCCI.
>
> 3) David M. Koziarz, is a citizen of the State of Michigan, resident within the district and acted as an authorized agent for TMP Associates, Inc., in the capacity of field supervisor and knowingly and intentionally assisted in the scheme of TMP to conceal and deceive through a planned cover up TMP's design malpractice.

e.   The Taylor Defendants

> 1) City of Taylor is a municipal corporation which is located and maintains offices with in the district and acted under color of law to cover up the design defects of Yopps and Wilkie .

7

2) Gerald L. Couch, is a citizen of the State of Michigan and resident within the district who acted under color of law as city manager for the City Taylor .

3) Cameron Priebe, is a citizen of the State of Michigan and resides within the district and acted under color of law as mayor of the City of Taylor.

4) Yopp & Wilkie is a citizen of the State of Michigan, maintains offices within the district and is engaged in the profession of architecture.

5) John Wilkie is a citizen of the State of Michigan and is a principal and agent of Yopp and Wilkie.

6) David Zanley is a citizen of the State of Michigan and resides within the district. Zanley was a field architect, agent and employee of Yopp and Wilkie.

f. Oakland County Drain Defendants:

1) Oakland County Drain Commission is an agency of Oakland County and maintains its offices within the district and acts under color of law.

2) William Klockow , is a citizen of the State of Michigan and resides within the district . Klockow is also an engineer employed by and acting as authorized agent for Oakland County Drain Commission.

3) George Bondi. is a citizen of the State of Michigan and resident within the district, who acted under color of law as agent for the Drain

8

Commission.

g. Henry Ford Community College Defendants:

1) Henry Ford Community College, is a non-profit corporation which maintains offices within the district.

2) Terry Biernat is a citizen of the State of Michigan and resides within the district. Biernat was an agent and employee of Henry Ford at all times pertinent to the allegations of the complaint.

3) Terry Stollstiemer is a citizen of the State of Michigan and resides within the district. Stollsteimer acted as agent and employee of Henry Ford Community College at all times pertinent to these proceedings.

h) Defendant R.V. Buric Construction Management Consultants, Inc., hereinafter " R.V. Buric"is believed to be a corporation and citizen of the State of Ohio and its agent, employee, Defendant, Gary Mottler, is also believed to be a citizen of the State of Ohio.

13.   Clifford Taylor, Chief Justice of the Supreme Court of the State of Michigan is a public officer and chief administrator of the Supreme Court, a constitutionally created arm of Michigan government and principally responsible for oversight of the administration of the "one court"  State judicial system including adherence to and protection of individual constitutional rights and privileges of citizenship in all levels of that one court . Allegations and relief requested against this defendant are limited to Count I, only.

COUNT I –

**The 5th and 14th Amendments of the U.S. Constitution and Michigan Constitution guaranteed Marcellis and MCCI against loss of life, liberty and property without due process and equal protection of the law and said rights and protections were intentionally denied them by State of Michigan.**

State of Michigan and its judicial system **deliberately and intentionally** violated Tony Marcelli, Cynthia Marcelli and MCCI's **constitutional rights guaranteed by the U.S. Constitution and Michigan Constitution** and also **deliberately and intentionally denied** Plaintiff's protection of these constitutional guarantees in violation of 42 USC 1983 &1985..

An Indemnity agreement was personally signed by Tony and Cynthia Marcelli pledging themselves, by private contract, and their property as security and collateral in order to assist MCCI to obtain surety bonds from OFIC to be called upon **"Only in the event of defaults by MCCI on the bonds and principal contracts with owners."** Marcelli's constitutionally protected freedom to contract was intentionally and deliberately violated by judicial modification of the indemnity agreement.

14. Plaintiffs incorporate by this reference the allegations of paragraphs 1 through 13, inclusive.

15. The Indemnity Agreement was a private or personal contract between Tony and Cynthia Marcelli, indemnitors and OFIC , as indemnitee,and was never presented to the Owners nor was it ever incorporated into the owner's contract. It cannot be legally activated if MCCI has not defaulted in its contracts with the Owners.

16. Prior to 1996, MCCI was engaged in business as a general contractor who specialized in construction of federal, state, county and municipal projects and , as a standard condition of public projects, MCCI was contractually required to post both performance and payment bonds with the various owners.

17. At that time, surety contracts existed between MCCI , as obligor, and Westfield Companies subsidiary, Ohio Farmer's Insurance Company (OFIC) ,as surety

for hire on 10 owner or "primary contracts".

18.   The 10 bonded contracts included:

A. EMU Project - involved construction of a new physical plant for Eastern Michigan University in Ypsilanti. This project was complete and owner occupied in August, 1995. Contract receivable $534,329.59, plus extras.

B. Melvindale Project – involved the construction of a sewage pump station upon Owner's undisclosed environmentally contaminated property. Despite Owner delays and fraud, the project was complete and Owner occupied in April, 1996. Receivable $534,329.59, plus extras.

C. Taylor Project – involved renovation and addition to the Taylor City Hall. This project was substantially complete and owner occupied in May, 1995. Payments due MCCI for contract balance, including sums held in Owner retention and extra-contractual work remained pending. Receivable valued at $225,840.00 plus extras, contract balance, change orders, overhead and profit and delay claims. Total overall value of $1.3 Million.

D.  Lapeer Project – involved construction of a community center for the City of Lapeer. This project was substantially completed and owner occupied in May, 1995. Owner payment of contract balance, including owner held retention and payment for extra-contractual work remained pending. Receivable $257,583.00 plus extras, change orders, overhead and profit claims total overall value of $1.2 Million.

E.  Orchard Lake Village project – involved construction of a sanitary collection and disposal system and water control system for Orchard Lake Village. This project was substantially complete and owner occupied in December, 1996.  Owner payment of contract balance, including owner held retention amounts and payment for extra-contractual work remained pending. Environmental Protection Agency funded project. Contract receivable $483,410.00, plus extras, profit and overhead, delay costs, legal expenses and losses to private landowners totaling $1.3 Million.

F.  Executive Plaza project – involved remedies to structural and water problems in the State of Michigan Executive Plaza Building located in Detroit, Michigan. This project was substantially completed and owner occupied in December, 1996.  Owner payment of contract balance, including Owner retention and Contract receivable $1,366,570.00 plus extras.

G. Olympia Armory project - involved construction of the Olympia Armory for the Department of Military Affairs on the site of the former Olympia Arena. This Project was entirely complete in 1993 and Owner payment of contract balance, retention and extra-contractual work remained pending. Federally funded with balance due MCCI of $11,000.00.

H. Henry Ford Community College project – involved renovation and addition to the Dearborn Heights Center for the college. This project was entirely completed in 1993 and Owner payment of the contract balance of $43,000.00, plus value of claims for Owner delays, overhead and profit.

I. Diggs/Forest Park project – involved site improvements at a public housing project for the City of Detroit. This contract was terminated by mutual agreement of the parties without breach by either. Department of Housing and Urban Development funded and $368,000.00 owed MCCI, plus delay damages, overhead and profit.

J. Wyandotte Project ·· involved the expansion and improvement of a sewage treatment facility in the City of Wyandotte and was entirely completed in May, 1995. Owner payment of contract balance and sums held in retention and extra-contractual work remained pending. Receivable $230,046.00, plus extras.

19.    In the course of performance of the 10 bonded projects, MCCI entered

into contracts with various and sundry subcontractors and said subcontracts or

"secondary contracts" contained a "pay when paid" clause.

20.    MCCI 's primary contracts and surety contract required MCCI to

perform according to the plans and specifications of the primary contracts documents,

only.

21.    MCCI's secondary contracts and surety contract required MCCI to pay

according to the terms of the secondary or subcontractor contracts which included a "pay,

when paid" clause. Also, MCCI purchase orders contained a "pay when paid clause."

12

22.     Plaintiffs, Tony Marcelli and Cynthia Marcelli, entered into "tertiary or third party contract" known as an indemnity agreement by which they personally obligated themselves and engaged their general credit to provide collateral and indemnify OFIC from loss on its surety bonds, **"only if"** MCCI defaulted in performance of the primary contracts or failed to pay according to the terms of the secondary contracts. Exhibit 1, Marcelli – Ohio Farmer Indemnity Agreement, dated March 5, 1990, 5 pages,attached

23.     On or about March 28, 1995, Defendant Gerald L. Couch, created and mailed a letter to Defendant, James M. Walker, falsely reporting information related to the status of City of Taylor project. Upon information and belief, it is believed that Couch had been providing  periodic reports to Walker prior to that date.

24     Subsequently, Defendant Walker exchanged correspondence with Couch, attended meetings with the Couch and others, received correspondence from legal counsel for MCCI and City of Taylor concerning the completion of the project.

25.     Commencing on or about October 15, 1995, Plaintiff's surety, OFIC commenced voluntary payment to a MCCI subcontractor on the Taylor Project without notice, knowledge or approval of MCCI.

26.     Upon receipt of demand from OFIC, MCCI promptly reimbursed OFIC .

27.     In November, 1995, OFIC's agent and attorney, James M.Walker, appeared in MCCI's offices expressing concern over the payment status of subcontractors on the "EMU" project.

28.     In the course of conversation, MCCI president, Tony Marcelli,

described the status of the EMU project as being completed effective August 1, 1995, and that Owner owed MCCI approximately $800,000.00.

29.     At that time, Marcelli informed Walker that litigation was likely necessary to obtain Owner performance (i.e. payment) and that subcontractor payments would follow collection based upon the subcontract's "pay, when paid" clause.

30.     Marcelli further reviewed the status of all 10 bonded projects and fully informed Walker of all issues related to Owner liability and defenses, including instances of substantial Owner performance delays, "cardinal changes" caused by Owner fraud or intentional withholding of superior information, design change delays, and architect malpractice. In particular, Marcelli informed Walker that the Melvindale project excavation spoils were contaminated with tar, corrosive groundwater and hazardous materials, posed obvious environmental risks and further advised that the City had been notified in writing on or about October 13, 1995.

31.     Walker then inquired about the financial status of MCCI's bonded projects and Marcelli disclosed that MCCI's total outstanding liabilities to be approximately $2.1Million.

32.     Marcelli also disclosed that MCCI's claims against all owners for contract work, approved extra-work, and extra-work pending approval was in excess of $7 Million.

33.     Marcelli further informed Walker that MCCI's performance upon all the contracts was complete, owner occupied, or pended completion of punch list items for which MCCI subcontractors were contractually obligated to complete without additional

14

charge to MCCI, OFIC or the Owners.

34.    At or near the conclusion of the meeting Walker requested access to
MCCI's records to verify Marcelli's representations and Marcelli granted Walker
and OFIC complete access to MCCI records for inspection and copying.

35.    Commencing in November, 1995 and continuing through December, 1995
and into January, 1996, OFIC, through its agents, attorney – accountant, James M.Walker
and attorney-engineer, Gus Yogmour, inspected and copied every contract, subcontract,
letter, invoice, bank records, payment history and every other document or thing Walker
and Yogmour deemed necessary to acquire full and complete knowledge that Marcelli's
representations of fact were indeed true.

36.    As a direct and proximate consequence of receipt of knowledge contained
in MCCI's confidential and proprietary business records, Walker, Yogmour and OFIC, in
consultation with Defendant Ronald A. Deneweth, embarked upon a scheme to extort and
appropriate in excess of $4 Million from MCCI for its own purposes.

37. On or about December 29, 1995, Tony Marcelli, on behalf of MCCI , sent a
letter to James M. Walker and OFIC  instructing Walker not to make any payments to
to subcontractors on the EMU project.  Marcelli's letter also informed Walker of
settlement prospects being negotiated with major subcontractors.  Marcelli further
informed Walker that a settlement conference was in the scheduling process with Pat
Walsh, engineer for Michigan department of Management and Budget.

38.    On or about January 19, 1996, Defendant Cameron Priebe sent a letter
to Walker purporting to default MCCI.

39.    MCCI is informed and believes that Walker considered the City of

Taylor default to be abusive and ineffective and informed MCCI's legal counsel.

40.. On or about January 22, 1996, Walker and Tony Marcelli attended a meeting with representatives of the City of Melvindale, Eric Witte, Randall Pentiuk and a representative of Charles Raines Company, during the course of which the financial payments due Marcelli was discussed and the contract was extended without default.

41. Upon information and belief, MCCI and Marcelli believe between January 22, 1996 and January 29, 1996, Defendant, James M. Walker and OFIC initiated the next step in his a plan to seize control of MCCI by voluntarily paying subcontractors, including, specifically the major EMU subcontractors for the purpose of preventing MCCI's settlement with EMU and receipt of payment.

42. On January 29, 1996, despite his full and complete knowledge and although there was no litigation pending by any subcontractor against MCCI and no notice under the prime contracts by any Owner alleging a MCCI breach for non-payment of subcontractors, OFIC, through its agent, Walker, commenced voluntary payments to MCCI subcontractors on the EMU project.

43. As part of the scheme of extortion and coercion to obtain MCCI,'s property for his and OFIC's own purposes, James Walker, did, on or about February 5, 1996, and other dates, informed project Owners to withhold payments to MCCI by creation of the false appearance of OFIC's voluntary payments to subcontractors were involuntary or were required under the payment bond and, in either event falsely communicated to the 10 Owners that MCCI was not paying its subcontractors when due.

Further, the correspondence falsely represented a claim to entitlement on the part of

OFIC to subrogation and threatened that Owner's failure to comply would release OFIC

from its surety obligation, *pro tanto*, and would expose Owners to litigation if payments

were made despite Walker's threat. The Owners complied with the requests.

44.     On or about September 29, 1997, OFIC demanded MCCI , Tony

Marcelli and Cynthia Marcelli reimburse OFIC for its voluntary payments on the

secondary contracts.

45.     Also, on September 29, 1997, OFIC commenced litigation in Oakland

County Circuit Court alleging MCCI's  breaches of contract and Marcellis

breach of the indemnity agreement. Exhibit 2, OFIC state court complaint, attached.

46.     On November 10, 1998, a motion for summary judgment was granted

against MCCI , Tony Marcelli and Cynthia Marcelli without any judicial or jury finding

that MCCI had defaulted or committed a material breach in performance of the primary

contracts or payment of the secondary contracts upon which the surety contracts were

founded.  Entry of Judgment followed.  Exhibit 3 Opinion and Order, dated November

10, 1998 & Exhibit 4, Judgment of December 16, 1998, attached.

47.     Despite existence of genuine issues of material fact concerning whether

MCCI had materially defaulted in performance of the primary contracts being the

existence of a loss under the performance bonds, the state court intentionally violated

MCCI's and Marcelli's constitutional due process and equal protection rights by

construing language in a collateral, personal contract of indemnity to effectively forfeit

Marcellis' and MCCI's property interests in 10 contracts through judicial creation of

a contractual, <u>irrebuttable presumption</u> that OFIC acted in "good faith"

17

in its voluntary, pre-loss, payment of subcontractor claims, thereby, established default in the indemnity contract and wrongfully concluded that "default", thus established, in the collateral indemnity agreement established default in MCCI's performance of Owner's contracts without trial upon the controverted factually intense issue of whether MCCI was guilty of material breaches to the contract such that a "default" might exist as required by the cited constitutional guarantees upon which Plaintiffs rely.  Exhibits 5, Affidavit of Tony Marcelli & 6, Affidavits of Richard fergusoion and Angelo Zervos, attached.  Pleading in the alternative, Plaintiffs' contract was re-written by the Court to delete the requirement of surety good faith.

48.    Further, State of Michigan's agents and public officials violated Plaintiffs' constitutional right to procedural and substantive due process  and equal protection as they:

a.    failed to distinguish OFIC's alleged pre-loss payments under the EMU payment bond from its alleged post-loss payments.

b.    failed to require any showing of good faith on the part of OFIC in its voluntary and independent decision to make pre-loss payments,

c.    Allowed pre-loss payments by the surety to serve as a basis for surety solicited declarations of default by Owners triggering OFIC's "loss" obligations under the performance bonds.

d.    Allowed surety solicited Owner's defaults to serve as "loss" to justify subsequent surety payments as presumptive "good faith" payments under the Indemnity agreement,

e.    deprived MCCI of a hearing and trial to prove the allegations contained in affidavits supplied by MCCI that OFIC  prematurely intervened and inserted itself into MCCI's business contrary to industry standards given the completion or substantial completion of all the projects, save one, which had been terminated for "owner convenience" without fault of MCCI.

18

f.  deprived MCCI of the opportunity to plead and prove the allegations of its proposed counter-complaint

g.  deprived MCCI and its indemnitors of hearing and trial by jury upon the disputed factual existence of "good faith" payments under the indemnity agreement or existence of actual default upon either the performance or payment bonds, and

h.  deprived MCCI and its indemnitors of the benefit of OFIC's admission that OFIC had paid EMU subcontractors in error and that the OFIC claim  for indemnity and intervention in all 10 MCCI contracts was predicated upon these voluntary and unjustified payments

49.  Plaintiffs contend that Clifford Taylor, chief justice of the Michigan

Supreme Court, in his representative capacity on behalf of  the State of Michigan,

through its public officials, being judges of the constitutionally defined "one court of

justice", intentionally and deliberately applied a rule adopted by the Michigan Supreme

Court under its constitutional rule making authority, being MCR 2.116 in an arbitrary,

capricious and unreasonable manner to re-write Plaintiff's contract and improperly grant

judgment against them and, thereby, depriving them of their constitutional rights to trial

and trial by jury, among other constitutionally protected rights, privileges and

immunities.

50.  Subsequent proceedings in the Michigan Supreme Court, Court of

Appeals, Wayne County Circuit Court, Court of Claims, Lapeer County Circuit Court

and Oakland County Circuit Court have failed to remedy this flagrant violation of

Plaintiffs' rights and Plaintiffs' attempts to obtain relief in state courts ended March 26,

2006.  Meanwhile, no Court has ever found MCCI guilty of a material breach of 10

Owner's contracts sufficient to establish a default  in any of the 10 primary contracts

within the meaning of "default" as a term uniquely defined in construction law and as

commonly understood in the construction industry.  Exhibit 7, Opinions of Michigan

19

Court of Appeals, dated November 9, 2001 and June 23, 2005, respectively, attached.

51.    As a matter of law, the term, default, in a construction contracts context

distinguishes between mere breach and default.  To constitute legal default there must be

a material breach or a series of material breaches of such a magnitude that the Owner is

justified in terminating the contract.  *L&A Contracting Co. v Southern Concrete Services,*

*Inc.,* 17 F.3d 106 (5th Cir. 1994).

52.    As a matter of law, "materiality" of an alleged breach has been defined as:

(a) Whether the breach operated to defeat the bargained for objective of the
parties;
(b) whether the breach caused a disproportionate prejudice to the non-breaching
party;
(c) whether custom and usage considers such a breach to be material; and
(d) whether the allowance of reciprocal non-performance will result in the accrual
of an unreasonable and unfair advantage.

See *Eastern Illinois Trust and Savings Bank v. Janden,* 826 F.2d 615 (7th Cir. 1987).

53.    Courts of the State of Michigan perpetuated the intentional deprivation of

Plaintiffs' due process rights and equal protection guarantees after OFIC's disingenuous

admission, upon the record, that it had been "mistaken" in paying MCCI subcontractors

although payments had been made with full knowledge that such payments were not both

due and owing,  and, as a result, OFIC was rendered a mere volunteer without right to

reimbursement from MCCI or its indemnitors.

54.    As a direct and proximate consequence of these intentional constitutional

infringements upon Plaintiffs' rights, judgment entered, without trial, against MCCI ,

Tony Marcelli and Cynthia Marcelli in the amount of $6.648 Million Dollars, more or

less, and subject to later revision.

55.    Subsequently, at the invitation and suggestion of OFIC,  MCCI

20

commenced litigation against the 10 Owners in Wayne County Circuit Court
to enforce its contract rights and collect sums due and owing MCCI, as well as , sums
owed MCCI for contract extras and damages for owner's delay including increased
overhead and supervisory expenses.

56.    In that matter and as a direct consequence of judgment entered
in Oakland Circuit Court, MCCI was stripped of its property interest in the 10 contract
claims and OFIC was allowed to intervene and prosecute MCCI's claims.

57.  As a direct and proximate consequence of summary seizure of Plaintiff's
property, MCCI and Marcellis have suffered extreme financial hardship and loss of their
former livelihood.  Further, Marcellis'have endured more than 10 years of mental and
emotional distress, humiliation, anguish, infringement of life, liberty and property
interests, interference with and loss or impairment of normal enjoyment of life, loss or
diminution of their expectancy and entitlement to rights, protections, privileges and
immunities guaranteed to them as citizens by the Constitution of the United States of
America for which they seek compensation.

58.    Marcellis and MCCI are persons entitled to equal protection of the
substantive and procedural due process of law guaranteed by the 5th and 14th
amendments to the Constitution of the United States and Michigan constitution of 1963,
art. 1, section 17.

59.    Marcellis and MCCI are persons with contract rights and property interests
whose rights to due process were violated by state action by summary judicial action
imposing liability for breach of contract without any finding of default in the primary

21

contracts resulting in violation of Plaintiff's constitutionally protected contract rights.

60.     Marcelli and MCCI are persons with contract rights which are, with some limitations, constitutionally guaranteed from impairment by any governmental entity, including, freedom from judicial modification. U.S. Constitution, art. 1, §10 and Mich Constitution of 1963, art. 1, §10.  See *Shirley Rory, et al. v Continental Insurance Company,* 473 Mich 457, 703 NW 2d 23, (2005) for a statement of constitutional privilege from impairment of contract.

61.     That as direct and proximate consequence of the foregoing, Marcellis and MCCI  were denied both substantive and procedural due process, were denied equal protection of law and suffered a taking of their property by state action in violation of the constitutional guarantees of the 5th and 14th amendments to the United States Constitution in violation of 42 U.S.C. §1983 and 1985.

62.     Plaintiffs have no state law remedy or have exhausted their remedies. Plaintiffs' petition for relief from judgment was denied, on appeal, by decision dated June 23, 2005.

Wherefore, Plaintiffs Tony Marcelli, Cynthis Marcelli and Marcelli Construction Company, Inc. believe judgment in the amount of **$300 Million or such other sum** as may be found would adequately and fully compensate Plaintiffs, together with an award of costs, interest and attorney's fees.  However, Plaintiffs request the Court issue its declaratory judgment finding that Plaintiffs rights, privileges and immunities were intentionally violated and requests injunctive relief restraining and enjoining Michigan's one court of justice from rendering further assistance and aid to Defendant, Ohio Farmer's Insurance Company, their assignees, agents and successors .

22

**Plaintiffs demand trial by jury of all issues so triable..**

COUNT II – Conspiracy to Deny Equal Protection Of Law
to Plaintiffs Pursuant to 42 U.S.C.1983, 1985(2)(3)

63.     Plaintiffs incorporate by this reference the allegations contained in
paragraphs 1 -62, inclusive.

64.     Pleading in the alternative to the allegations of liability contained in Count
I, Plaintiffs believe that Defendants, James M. Walker, Gus Yogmour, Ronald A.
Deneweth, on behalf of Defendant OFIC conspired among themselves and in
combination with or with the aid and assistance of representatives of City of Taylor,
City of Lapeer, Oakland County Drain Commission, City of Melvindale and Henry
Ford Community College to interfere with Plaintiffs access to the courts of the State of
Michigan through use of false and fraudulent statements of contractor default.

65.     The false and fraudulent owner statements of default were employed
in combination with perjurious affidavits of James M. Walker and Gus Yogmour to
impede, hinder, obstruct and defeat the due course of justice with the intent to
deprive Plaintiffs the equal protection of the laws and to injure their property interests in
violation of 42 U.S.C.1985(2).

66.     Plaintiffs, Tony Marcelli and  Cynthia Marcelli  were principals of MCCI
and members of classes to be  protected from discrimination due to age, ethnic origin or
gender, and were vulnerable  to legal machinations and manipulation as intended victims
of criminal activity as described, *infra*.

23

67.     The scheme or conspiracy to interfere with Plaintiffs' access to the courts of the State of Michigan was masterminded by James W. Walker, and was intended to work and did, in fact work, upon the false premise presented to the Courts that MCCI had defaulted in its performance with 10 Owner contracts and as a result, OFIC assumed the performance of MCCI bonded obligations for which OFIC was entitled to indemnity.

68.     In fact, Walker, Yogmour, Deneweth and OFIC were covering up voluntary payments made before an event of loss had occurred for which OFIC was not entitled to indemnity or exoneration.

69.     As a direct and proximate consequence of Defendant's victimization of Plaintiffs due to their age, ethnic origin or gender and vulnerability to superior legal knowledge and ability, Plaintiffs access to the Courts of the State of Michigan was impeded, hindered, obstructed and defeated by acts of deceit and perjury of lawyers, Walker and Yogmour, resulting in the trial court short-circuiting the constitutionally protected fact finding procedure of trial by jury and entered judgment against Plaintiffs in the amount of $6.684 Million.

70.     Further, Defendant Deneweth, in combination with Walker and Yogmour, knowingly utilized the perjurious affidavits with intent to deprive Plaintiffs of equal protection of the laws.

71.     Defendant's further intended the consequence of their exercise of actionable bias with intent to deprive Plaintiffs of equal protection of law for the purpose of acquiring the property of MCCI and the individual Marcellis'.

24

72. As a direct and proximate consequence, MCCI and Marcellis have been damaged in an amount in excess of $100 Million in economic damages, loss of business opportunity, loss of future economic advantage, mental and emotional distress, humiliation, anguish, infringement of life, liberty and property interests, interference with and loss of normal enjoyment of life for a period of 10 years, loss or diminution of expectancy and entitlement to rights, protections, privileges and immunities of citizenship as guaranteed by the Constitution of the United States of America..

Wherefore, Plaintiffs believe an award of damages in the amount of $300 Million or whatever amount the jury finds them to be entitled together with an award of costs, interest and attorney's fees would provide adequate compensation.

**Plaintiffs demand trial by jury of all issues so triable..**

## COUNT III – 18 U.S.C. §1962(a)

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION

**The 5th and 14th Amendments of the U.S. Constitution and Michigan Constitution guaranteed Marcellis and MCCI against loss of life, liberty and property without due process and equal protection of the law and said rights and protections were intentionally denied them by State of Michigan.**

State of Michigan and its judicial system **deliberately and intentionally** violated Tony Marcelli, Cynthia Marcelli and MCCI's constitutional rights guaranteed by the U.S. Constitution and Michigan Constitution and also **deliberately and intentionally denied** Plaintiff's protection of these constitutional guarantees in violation of 42 USC 1983 &1985..

An Indemnity agreement was personally signed by Tony and Cynthia Marcelli pledging themselves, by private contract, and their property as security and collateral in order to assist MCCI to obtain surety bonds from OFIC to be called upon **"Only in the event of defaults by MCCI on the bonds and**

25

**principal contracts with owners.**" Marcelli's constitutionally protected freedom to contract was intentionally and deliberately violated by judicial modification of the indemnity agreement.

## RACKETEERING CONSPIRACY

73. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 70, inclusive by this reference.

74.    Plaintiff, Marcelli Construction Company, Inc., (MCCI) is a Michigan profit corporation and was a business enterprise engaged in the construction business for municipal, state and federal building and infrastructure construction projects which affect interstate commerce and are, in whole or in part, funded by tax payers of the United States, State of Michigan and local governmental units.

75.    Defendants, Westfield Companies, Ohio Farmer's Insurance Company, James Walker, Gus Yogmour, Ronald Deneweth, Shier, Parfit and Deneweth,P.C., Randall Pentiuk, Eric Witte, Charles Raines, Charles Raines Company, Inc., Souheil K. Sabak, TMP Assoc.Inc., Timothy A.Casai, David M. Koziarz, George Strand, Ronald Shamblin, Raymond Turcyn, Gerald L. Couch, Cameron Priebe, Yopp and Wilkie, John Wilkie, David Zanley, Terry Biernat, Terry Stollsteimer, William Klockow and George Bondi, R.V. Buric and Gary Mottler..... are persons within the meaning of 18 U.S.C. §1961(3) who, through a pattern of racketeering activity, acquired and or maintained, directly or indirectly, an interest in and control of the MCCI enterprise or are associated with, and aided and abetted the racketeering activity..

76.    Among the predicate acts which constitute this pattern of racketeering activity are:

26

a)      James Walker, as bond counsel for OFIC, through the means and facilities

of interstate commerce including telecommunications and the United States Postal

Service solicited and procured false and fraudulent declarations of default from owners

of some of 10 construction projects after the projects had been substantially completed

and/or were owner occupied.  Walker letters are dated as follows:

> i.  City of Melvindale , dated, June 27, 1996 and mailed on or about that
> date.
>
> ii. Oakland County Drain Commission,  dated, May 23, 1996, and mailed
> on or about that date.
>
> ii. City of Lapeer, dated, March 11, 1996, and mailed on or about that
> date.

b)      Upon information and belief, it is believed that James Walker, bond

counsel for OFIC , through the means and facilities of interstate commerce including

telecommunications and U.S. Mail, solicited and procured false and fraudulent statements

of claims from MCCI subcontractors upon the promise to pay even though said false

claims expressly or impliedly represented that said sums of money were both "due and

owing", when MCCI's subcontract documents contained a "pay, when paid" clause

rendering such sums as may have been owed by MCCI not yet due.  Plaintiffs are

uncertain of the number of the hundreds of subcontractors contacted, but , believes

among those directly contacted by Walker were Boone & Darr and Dave Couch.  In

violation of 18 U.S.C.§1341.

c)      Walker and OFIC, employed the facilities of interstate commerce,

including telecommunications and U.S. Mail and the banking system to knowingly pay

the Walker solicited false and fraudulent claims of MCCI's sub contractors.  In violation

27

of 18 U.S.C.§ 1341.

d)      James Walker, Gus Yogmour and Ronald Denewith employed the facilities of interstate commerce to communicate, prepare, and distribute false and perjurious affidavits executed by Walker and Yogmour, under oath, which knowingly and intentionally falsely verify that MCCI had defaulted upon its contracts with project owners and relied upon the false declarations of default by the Cameron Priebe and the subsequently dated false statements of default solicited and procured by Walker, Deneweth, and OFIC.

e)      Defendants, Walker, Yogmour and Deneweth employed the fruit of their conspiratorial labors and employed the facilities of interstate commerce including telecommunications, U.S. Mail and federally regulated banking institutions to prosecute a false claim in the Oakland County Circuit Court in which they intentionally, falsely alleged and knowingly employed false evidence and affidavits to support a complaint against the enterprise for purposes of gaining control of the enterprise and its 10 contract receivables.

f)      A judgment was obtained in favor of OFIC through criminal use of false, fraudulent evidence and perjurious affidavit testimony of Walker and Yogmour related to material issues and racketeering defendants have continued to employ the means and facilities of interstate commerce including telecommunications, U.S. Mail and transfer of funds through the federally regulated banking system to continue their racketeering activity and obstruct the due administration of justice in defense of MCCI's unsuccessful attempts to obtain relief from judgment. Mich. Comp. Laws, 750.422.

g)      Defendants obtained lawful control, through unlawful means, of the

28

enterprise's property and have continued their exercise of control through litigation with the 10 governmental entities and have employed the facilities of interstate commerce including telecommunications, U.S. Mail and the federally regulated banking system to liquidate the enterprise's property interests.

      h)     Upon information and belief, Plaintiffs believe that Defendants through the facilities of interstate commerce to communicate and further their criminal conspiracy by acts which include , among other things,  hired or retained the services of others to take supervisory control of Plaintiff's contracts, and distributed proceeds of MCCI's property to these parties and, further, Plaintiffs believe that the sums paid to these third parties were exorbitant, excessive and intended to conceal their criminal conspiracy by depriving MCCI of financial resources to pursue its legal remedies and, upon information and belief, OFIC reinsured its risk of loss with carrier or carriers known to OFIC, but unknown to Plaintiffs.

      i)     Walker on behalf of himself and his co-conspirators, violated False Statements Act, being 18 U.S.C.§ 1001 and False Claims Act,  18 U.S.C.§287 through means of correspondence delivered through the U.S. Mail, in violation of 18 U.S.C.§1341, by submitting knowingly false written statements to an agency or department of the United States, as well as, agents of local government disbursing federal funds to falsely claim payment of monies from the United States or from a state or local disbursing agent of federal funds disbursed under supervision of a federal agency or department.  More particularly:

              1)  Olympia Armory. Department of Defense  ($11,000.00)

2) Diggs Department of Health and Urban Affairs (HUD) ( in excess of $368,,000.00)

3) Village of Orchard Lake -- Environmental Protection Agency $450,000.00)

j.  In combination or association, Defendants Walker, Yogmour, OFIC, Deneweth, Pentiuk, Witte, Raines, Sabak, Couch, Klockow, Stollsteimer, Biernat, Shamblin, TMP Associates, Timothy A. Casai, aided and abetted or joined a conspiracy to obtain the property of MCCI and its indemnitors, Tony and Cynthia Marcelli, acting jointly under color of official right did declare MCCI in default upon contracts which had been substantially completed and/or were owner occupied, in violation of Hobbs act, being 18 U.S.C. 1951.

77.  Walker and OFIC enlisted the aid and assistance or, alternatively, joined into a series of additional fraudulent and criminal acts or conspiracies they deemed necessary to implement their overarching racketeering activity.

a.  On a date known to Defendants Walker and OFIC, but unknown to Plaintiffs, with full knowledge of the falsity of Couch and Priebe's false statements, entered into a conspiracy and agreement with the City of Taylor and Taylor City Manager, Gerald L. Couch and Cameron Priebe , John Wilkie, Yopps and Wilkie and David Zanley,to adopt and utilize their false statements and allegations of MCCI default as part of Priebe and Couch's plan to extort money and property from MCCI . The plan or scheme was designed to cover up substantial construction cost overruns occasioned by Owner contract errors, design mistakes, (requiring more than 200 change orders) contract maladministration, Owner caused delays, including interference caused by a 7 month long picketing by organized labor organizations and other general

30

Owner incompetence with intent to avoid payment to MCCI for consequential cost

overruns and as a false basis for Owner declaration of default against MCCI. Upon

information and belief, it is believed that this agreement fostered and created an

expectation that Taylor would pay substantially less than all sums claimed by MCCI.

The conspirators later agreed to compromise MCCI's claims of $1.3 Million for

$251,000.00.

      b.     On a date known to Walker and Defendants, City of Melvindale and

Randall Pentiuk, which Plaintiffs believe, upon information and belief, was June 3, 1996,

Plaintiffs, a further agreement was added to the conspiracy; to wit:  Walker, on behalf of

himself and OFIC and Pentiuk, on behalf of himself and City of Melvindale, and its

engineer, Charles Raines  and Eric Witte, agreed to circumvent the environmental laws of

the United States and State of Michigan to conceal disturbance of a CERCLA Superfund

Site, reburying the hazardous materials excavated by MCCI  without notification to EPA

or MDNR or compliance with permitting process, through the artifice and ruse of an

Owner declared default to be solicited by co-conspirators Walker and OFIC ,with said

solicitation to include surety's  tender of performance by OFIC "to complete" MCCI's

performance, (i.e. rebury contaminated soils without a permit), after execution of a

certificate of substantial completion had been executed on April ---, 1996.  In criminal

combination, defendants conspired to violate CERCLA, SARA, and EPCRA being 42

U.S.C. §9601, et seq.,, Superfund Reauthorization Act of 1986, Pub. L. No. 99-499, 100

Stat. 1613 and 42 U.S.C.§§11001-11050 and  the criminal portion of Michigan's Natural

Resources and Environmental Protection Act being Mich. Comp L. 324.11151(3) by

31

reburying hazardous, toxic and known cancer causing materials in an attempt to avoid

civil penalty of strict liability of complete remediation expenses of the site. However,

this part of entire conspiracy was later abandoned once OFIC confirmed its and MCCI's

absolute defense arising from Melvindale's, Witte's and Raine's willful and intentional

concealment and willful failure to disclose of the Superfund status of the site in the

contract bid request and contract specifications and this despite Raines and City of

Melvindale's active participation in proceedings with EPA resulting in a consent order

with alleged polluters, Ford Motor Company and Detroit Edison Company, among

others. However, despite this partial abandonment of the conspiracy, Walker, Yogmour,

Deneweth and OFIC's plan to steal MCCI's assets continued unabated.

      c.     On a date known to Defendants Walker and OFIC, but unknown to

Plaintiffs, Defendants entered into a conspiracy with the Oakland County Drain

Commission and William Klockow to adopt and utilize false statements originally

created by Oakland County Drain Commission and William Klockow designed to cover

up contract errors, design mistakes, contract maladministration and Owner caused delays

and to avoid payments to MCCI for consequential cost overruns and said conspiracy to

defraud was adopted by Walker and OFIC as a false basis for Owner declared default as

solicited by Walker and OFIC . Upon information and belief, it is believed that this

agreement fostered an expectation and belief that Oakland County Drain Commission

would pay substantially less than sums claimed by MCCI. The conspirators later

compromised MCCI's claims of approximately $1.3 Million for $692,000.00.

      d.     On a date known to Defendants Walker and OFIC, but unknown to

Plaintiffs, Defendants Walker and OFIC entered into a conspiracy with City of Lapeer, Timothy Casai and TMP Assoc Inc. to adopt and utilize false and fraudulent statements originally created by TMP Assoc and Tim Casai and David Koziarz, to cover up TMP's architect design malpractice by knowingly and intentionally falsely alleging MCCI breach with the actual intent and by means of threats to shift financial responsibility to MCCI for consequential contract costs overruns and delays and said conspiracy was employed as a false basis for OFIC and Walker's solicited declaration of default of MCCI by City of Lapeer and TMP Assoc. It is believed upon information and belief, that this conspiratorial agreement fostered and created a belief that City of Lapeer would pay substantially less than all sums claimed by MCCI. Later, after conspirator OFIC and Walker gained control of MCCI the contract claims totaling approximately $1.2 Million were compromised for $400,000.00.

　　　　e.　　　On a date known to Defendants Walker and OFIC, but unknown to Plaintiffs, Walker and OFIC entered into a conspiracy with Henry Ford Community College and Terry Biernat to adopt and utilize false statements originally created by HFCC and Biernat to cover up Owner's financial responsibility for design errors, withholding superior knowledge, Owner extortion and Owner incompetence for the purpose and intention to avoid payment to MCCI for consequential cost overruns and agreed that such adopted false factual basis would serve to support OFIC's and Walker's solicited Owner declaration of default against MCCI. Upon information and belief, it is believed that the agreement fostered and created a belief by HFCC that they would pay less than all claims of MCCI once OFIC gained control of MCCI. Later, after OFIC and Walker gained control of MCCI's claims totaled in excess of $250,000.00. Those

claims were not presented in full and such claims as were made were settled and compromised for $43,011.55.

    f)    R.V. Buric and Gary Mottler in combination with and as agents for OFIC and Walker engaged in a further pattern or practice to extort money and property from Plaintiff MCCI and its indemnitors, Tony and Cynthia Marcelli, by engaging and agreeing to perform extra work or work outside MCCI's contractual obligations and purported to charge Plaintiffs as part of cost to complete..

    78.    After Walker and OFIC obtained control of MCCI, they then turned upon their co-conspirators and affirmatively alleged , under oath, that MCCI had never defaulted in its contracts with Melvindale, Taylor, Henry Ford, Oakland County Drain Commission and City of Lapeer.

    79.    These many acts of racketeering, designed to further a criminal conspiracy to defraud, U.S.C.§371, occurring within ten years of one another, constitute a pattern of racketeering within the meaning of 18 U.S.C.§1961(5). The conspiracy and acts in furtherance of the conspiracy have continued to the present time.

    80.    Plaintiffs were directly and proximately injured in their business and property by reason of these violations of 18 U.S.C. §1962, in that, as a direct and proximate result of Defendants joint and concerted conduct and criminal activities, Plaintiffs have suffered damages including, the loss of revenues, including charges for extra work on the 10 contracts liquidated by Defendants, loss of business opportunities, loss of bonding capacity resulting in loss of future revenue and profits, good will and net

worth of the enterprise which Plaintiffs' believe exceeds $100 Million Dollars. Further,

Plaintiffs suffered mental and emotional distress and anguish, humiliation, infringement

of and loss of normal enjoyment of life for a period in excess of 10 years, loss or

diminution and interference with their life, liberty and property interests, and loss,

interference or impairment of their expectation and entitlement to the rights, protections,

Privileges and immunities of citizenship as guaranteed by the Constitution of the United

States of America, as amended.

81.    By reason of Defendants' violation of 18 U.S.C.§1962, Plaintiffs' believe

they are entitled, pursuant to 18 U.S.C. §1964(c) to treble damages upon actual damages

sustained of $100 Million Dollars, together with interest and a reasonable attorney's fee

incurred in the prosecution of this claim.  In total, Plaintiffs believe $300 Million Dollars

will adequately compensate them for their actual losses under Count II.

Wherefore, Plaintiffs demand judgment in the amount of $300 Million, actual

damages,  or such other amount as the jury may award after trial, trebled, together with

an award of costs, interest and attorney's fees.

**Plaintiffs demand trial by jury.**

## COUNT IV – 18 U.S.C.§1962(b)

82.    Plaintiff incorporate by this reference the allegations contained in

paragraphs 1 through 81, inclusive.

83.    Defendants acquired an interest in the MCCI enterprise and an interest in

the conspiratorial enterprise or associations in-fact, as defined by 18 US.C.§1961(4), for

the purpose of engaging in a fraudulent, extortionate course of conduct.   The enterprise

or association in-fact operated to extort Plaintiff corporation and individual defendants of their property through a scheme to perpetrate a fraud the Courts of the State Michigan in (1) Ohio Farmer Insurance Company v Marcelli Construction Co., Inc. and (2) engaged in sham proceedings in Marcelli Construction Company Inc., et al. v City of Lapcer, et al., Marcelli Construction Company, Inc., et al. v City of Melvindale, and Marcelli Construction Company, Inc., et al. v Oakland County Drain Commission to complete the fraud upon Plaintiffs.

84.     Defendants acquired or maintained, directly or indirectly, an interest in the enterprises through a pattern of racketeering activity, as defined by 18 U.S.C.§1961 (1) and 1961 (5), by use of the U.S. Mail to obtain false owner declarations of default, and other crimes as detailed elsewhere in this complaint. The numerous predicate acts of criminal activity occurred on many occasions and form a pattern of conduct in violation of the laws of the United States and State of Michigan as detailed elsewhere.

85.     The conduct alleged violates 18 U.S.C.§1962(b).

Wherefore, Plaintiffs demand judgment against all RICO Defendants in the amount of three times actual damages, plus interest and a reasonable attorney's fees. Plaintiffs request judgment in the amount of $300 Million Dollars, as actual damages. **Plaintiffs demand trial by jury.**

## COUNT V- 18 U.S.C.§1962 (c)

86.     Plaintiffs reallege and incorporate by this reference the allegations contained in paragraphs 1 through 85, inclusive.

87.     With actual intent, the RICO defendants, were employed by or associated

with the enterprise to defraud , extort and steal the property of Plaintiffs through schemes
to defraud the Courts of the State of Michigan in  Ohio Farmer Insurance Company v
Marcelli Construction Co., Inc. and to allocate MCCI's assets to be later determined.

88.     Through their criminal enterprise, Rico defendants acquired control of
MCCI's litigation claims and directly conducted, participated in the conduct of
and controlled the legal affairs or claims of MCCI .

89.     As a direct and proximate consequence of the criminal activity
and racketeering of the RICO Defendants, Plaintiff MCCI lost the value of its contract
receivables, its business, including goodwill, lost opportunities, and other economic
damages, and the individual Marcelli plaintiffs, as indemnitors , suffered the loss of their
individual property, including wages, bank accounts, and were forced to incur additional
debt in excess of $2 Million Dollars. Further, Plaintiffs have suffered mental and
emotional distress, humiliation, anguish, infringement of life, liberty and property
interests, interference with and loss or impairment of normal enjoyment of life for a
period in excess of 10 years, loss or diminution of their expectancy and entitlement to the
rights, protections, privileges and immunities of citizenship as guaranteed  by the
Constitution of the United States of America, as amended.

Wherefore, Plaintiffs demand judgment in the amount of $300 Million Dollars,
actual damages, to be trebled, plus interest, costs and attorney's fees.

**Plaintiffs demand trial by jury.**

### COUNT VI – 18 U.S.C.§1962(d)

90.     Plaintiffs reallege and incorporate by this reference the allegations of

paragraphs 1 through 89, inclusive.

91.     RICO defendants are "persons" within the meaning of 18 U.S.C. §1961.

92.     Rico defendants conspired to violate §1962(a)(b)(c) during the period
commencing October, 1995 to the present time for the purpose of acquiring the property
of MCCI  and Marcellis through fraud and extortion in criminal combination to
perpetrate a fraud upon the Courts of the State of Michigan and Plaintiffs through the use
of creating knowingly false evidence and commission of perjury.

93.     Each of the RICO defendants committed acts in furtherance of the
conspiracy including solicitation of knowingly false statements of MCCI default,
false issuance of defaults on behalf of owners, executing under oath, knowingly false
affidavits supporting the wrongfully declared defaults, and the use of the U.S. Mail
and telecommunications systems to prepare, deliver and implement the conspiracy.

94.     Each of the RICO defendants knew their declarations of default were part
of a pattern of racketeering activity.

95.     As a direct and proximate consequence of defendants acts, Plaintiff MCCI
lost the value of its business and the individual Plaintiffs have suffered loss of income,
were compelled to incur substantial debt including borrowed funds and judgment debts
and intercepted income as well as mental and  emotional trauma, anguish, humiliation,
infringement of life, liberty and property interests, interference with, loss or impairment
of the normal enjoyment of life for a period of 10 years, loss or diminution of the
expectancy and entitlement to the rights, protections, privileges and immunities of
citizenship as guaranteed by the Constitution of the United States of America, as

38

amended, for which they seek award of actual damages in the amount of $300 Million,

actual damages, and treble damages, interest, costs and attorney's fees.

Wherefore, Plaintiffs, Marcelli Construction Company, Inc., Tony Marcelli and

Cynthia Marcelli request judgment in the amount of $300 Million dollars or such sum as

may be awarded to them by a jury, to be trebled, together with interest, costs and

attorney's fees.

**Plaintiffs demand trial by jury**.

## COUNT VII – LAWYER MALPRACTICE

**The 5th and 14th Amendments of the U.S. Constitution and Michigan Constitution guaranteed Marcellis and MCCI against loss of life, liberty and property without due process and equal protection of the law and said rights and protections were intentionally denied them by State of Michigan.**

State of Michigan and its judicial system **deliberately and intentionally** violated Tony Marcelli, Cynthia Marcelli and MCCI's constitutional rights guaranteed by the U.S. Constitution and Michigan Constitution and also **deliberately and intentionally denied** Plaintiff's protection of these constitutional guarantees in violation of 42 USC 1983 &1985..

An Indemnity agreement was personally signed by Tony and Cynthia Marcelli pledging themselves, by private contract, and their property as security and collateral in order to assist MCCI to obtain surety bonds from OFIC to be called upon **"Only in the event of defaults by MCCI on the bonds and principal contracts with owners."** Marcelli's constitutionally protected freedom to contract was intentionally and deliberately violated by judicial modification of the indemnity agreement.

96.    Plaintiffs reallege and incorporate by this reference the allegations

contained in paragraphs 1- 95, inclusive.

97.    Plaintiffs executed a power of attorney designating OFIC as their attorney

in fact incidental to and as part of documentation executed simultaneously with

a contract for payment and performance bonds and indemnity agreement required by
OFIC as a condition to act as surety on said bonds.

98.     Further, Walker fostered and created an attorney-client relationship of
trust and confidence through representations to Marcellis and MCCI that he was an
attorney, he was on "their side" and was working to protect their interests, and provided
legal advice upon which Marcelli and MCCI relied including, but not limited to
Walker's recommendation to Marcellis and MCCI that it was in their interest to replace
Tony Marcelli, as company president, and substitute Cynthia Marcelli, in his place.
Further, Walker drafted correspondence for MCCI and provided counsel and advice
on legal matters or matters having legal significance with the intention that MCCI rely
and upon which advice and counsel MCCI did rely.

99.     Pursuant to exercise of its position as attorney in fact, OFIC and Walker's
relationship as attorney at law, Walker and OFIC retained various attorneys to

(a)     protect Plaintiffs from false claims of owners and subcontractors upon the
performance and payment  bonds, respectively, and

(b)     to affirmatively assert Plaintiffs defenses against owner's declarations of
default on the prime contracts, and, thereby to avoid liability or minimize  losses, if any,
on such bonds upon which OFIC was engaged as surety, and

(c)     to assist in presentation of MCCI's efforts to prosecute collection of sums
held in retention and collection of unpaid extra – contractual work authorized and
remaining unpaid by the owners.

100.     On Plaintiffs behalf, OFIC hired or retained lawyers, James Walker, Gus

40

Yogmour, Ronald Denewith and Shier, Parfit and Denewith, PC to perform

OFIC's duties and undertakings as Plaintiffs' attorney–in–fact.

      101.    Defendant, OFIC , as Attorney in fact and Walker, Yogmour, Deneweth, and Deneweth firm owed Plaintiffs duties of undivided loyalty, and the exercise of that standard of care of the matters entrusted to them, including, but not limited to telling the complete truth and full disclosure to tribunals of the State of Michigan.

      102.    OFIC, Walker, Yogmour, Deneweth and the Deneweth Firm breached their duties and undertakings to Plaintiff, *inter alia*, including:

a) solicited and obtained false declarations of default from one or more of the 10 project owners in 10 construction projects in which MCCI was prime contractor.

b) solicited and obtained false statements of claims from MCCI subcontractors who expressly or impliedly represented that sums stated in such claims were "due and owing" when OFIC, Walker, Yougmour, Deneweth and the Deneweth Firm were fully knowledgeable that the subcontracts contained a "pay, when paid" clause and that MCCI had not been paid by the owners and, therefore, no subcontractor claims were both owing and due and, further, in many instances, subcontractor performance was incomplete.

      c)    solicited and voluntarily paid subcontractor claims that were not both owing and due.

      d)    procured and presented false evidence of alleged MCCI default of prime contract and default of payment of subcontractors in a court proceeding for the purposes of perpetrating a fraud upon the Court and Plaintiffs,

      e)    prepared and executed perjurious affidavits which represented as verified facts, based upon personal knowledge, that MCCI had defaulted in performance of the

prime contracts when affiants, Walker and Yogmour and attorney, Ronald Deneweth knew the projects were substantially complete and owner occupied, as well as, possessing full knowledge that owner statements of default had been procured by Walker, Yogmour and Deneweth and were materially and factually false.

      f)      Abandoned MCCI's claims for substantial extra charges to the owners of the prime contracts without MCCI's approval, consent or acquiescence.

      g)      Compromised MCCI claims for sums earned under the contracts without MCCI's approval, consent or acquiescence.

      h)      Rendered Plaintiff's "independent counsel", Gary Reeves, ineffective by paying his fees.

      i)      Agreed to pay extraordinary and excessive fees to persons and companies retained by OFIC to administer punch lists on some of the 10 contracts.

      j)      Each and every individual defendant possessed a divided loyalty between their obligations and undertakings to Plaintiffs and the agenda pursued on behalf of their paymaster, OFIC.

      103.    That as a direct and proximate consequence of these breaches of duty of undivided loyalty, Plaintiffs have been damaged including loss of the revenues from the 10 contract collections mishandled by Ronald Deneweth, loss of its business assets, including goodwill, lost of future earnings and net worth of the MCCI business. Further, the individual Plaintiffs have been damaged by loss of their personal property, emotional distress, mental anguish and outrage at Defendants' gross neglect, dereliction of their duty, and intentional misconduct. As a further consequence of Defendant's breaches of

duty individual Plaintiffs have been forced to borrow a sum in excess of $2 Million

Dollars to support themselves and will continue to do so in to the future. Further,

Plaintiffs are legal debtors pursuant to the judgment obtained by Defendants's fraud and

there remains a balance owed of several Million Dollars and Defendant's have

garnisheed Plaintiff, Cynthia Marcelli's wages. Plaintiffs have been damaged in an

amount in excess of $100 Million Dollars. In addition, Plaintiffs have endured 10 years

of mental and emotional distress, humiliation, anguish, infringement of life, liberty and

property interests, interference with and loss or impairment of normal enjoyment of life,

loss or diminution of their expectancy and entitlement to the rights, protections,

privileges and immunities of citizenship as guaranteed to citizens by the Constitution of

the United States of America, as amended.

Wherefore, Plaintiffs, Tony Marcelli, Cynthia Marcelli and Marcelli Construction

Company, Inc. demands judgment in whatever amount in excess of $300 Million they are

found to be entitled, together with interest, costs and attorney's fees.

**Plaintiffs demand trial by jury**

Respectfully Submitted,

December 8, 2006

Michael A. Reynolds P28540
Attorney for Plaintiffs
24684 Hathaway St.
Farmington, MI 48335
(248) 536-5030

43

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONY MARCELLI, CYNTHIA
MARCELLI, and MARCELLI CONSTRUCTION
COMPANY, INC., a Michigan corporation,

Plaintiffs,

Vs

JAMES M.WALKER, individually and as agent
For WESTFIELD COMPANIES, dba,
OHIO FARMER'S INSURANCE COMPANY,
 GUS YOGMOUR, Jr. RONALD
DENEWETH, SCHIER, PARFIT & DENEWETH, P.C.
And PARFIT & DENEWETH, P.C., et al.

Defendants.

_____/

## COMPLAINT EXHIBIT LIST

**Exhibit 1** -  Marcelli- Ohio Farmer Indemnity Agreement, dated March 5,
1990.  (5 pages).

**Exhibit 2** -  Ohio Farmer Complaint against Marcellis, filed September 29,
1997.  (9 pages)

**Exhibit 3** -  Opinion and Order, dated November 10, 1998. (5 pages).

**Exhibit 4** -   Judgment entered December 16, 1998. (1 page).

**Exhibit 5** -  Affidavit of Tony Marcelli ( 5 pages).

**Exhibit 6** -  Affidavits of Richard Ferguson and Angelo Zervos (4 pages).

**Exhibit 7** -  Opinions of Michigan Court of Appeals

# Ohio Farmers Insurance Co.
# Westfield Insurance Co.

Westfield Center, Ohio 44251

__ent of
__nnity  Marcelli  Construction

THIS AGREEMENT entered into by and between the undersigned, herein called Indemnitors, and Ohio Farmers Insurance Company and/or Westfield Insurance Company, both located at Westfield Center, Ohio herein called Surety, witnesseth:

WHEREAS, in the transaction of business certain bonds, undertakings, and other writings obligatory in the nature of a bond have heretofore been, and may hereafter be, required by, for, or on behalf of the Indemnitors or any one or more of the parties included in the designation Indemnitors, and application has been made and will hereafter be made to the Surety to execute such bonds, and as a prerequisite to the execution of such bond or bonds, the Surety requires complete indemnification.

WHEREAS, it may be necessary or desirable for one or more of the Companies listed above to execute bonds as Surety for or on behalf of the Indemnitors.

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling said Bonds.

NOW, THEREFORE, in consideration of the premises the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

## PREMIUMS

FIRST: The Indemnitors will pay to the Surety in such manner as may be agreed upon all premiums and charges of the Surety for the Bonds in accordance with its rate filings, its manual of rates, or as otherwise agreed upon until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

## INDEMNITY

SECOND: The Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety, the Indemnitors further agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

## ASSIGNMENT

THIRD: If such bond be given in connection with a contract, the Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual: (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

## TRUST FUND

FOURTH: If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

## UNIFORM COMMERCIAL CODE

FIFTH: That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

BD 5079



EXHIBIT

B

## TAKEOVER

**SIXTH:** In the event of any breach or default asserted by the obligee in any said Bonds, or the Contractor has abandoned the work on or forfeited any contract or contracts covered by any said Bonds, or has failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, Contractor's conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the National Bankruptcy Act, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Act, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of the same, and the Indemnitors shall promptly upon demand pay to the Surety all losses, and expenses so incurred.

## CHANGES

**SEVENTH:** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors.

**EIGHTH:** In the event of any claim or demand being made by the Surety against the Indemnitors, or any one or more of the parties so designated, by reason of the execution of a bond or bonds, the Company is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and we hereby expressly waive the right to be discharged and released by reason of the release of one or more of the joint debtors, and hereby consent to any settlement or composition that may hereafter be made.

**NINTH:** The liability of the Indemnitors hereunder shall not be affected by the failure of the Principal to sign any such bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, or the return or exchange of any collateral that may have been obtained and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

## ADVANCES

**TENTH:** The Surety is authorized and empowered to guarantee loans, to advance or lend to the Contractor any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors shall be responsible, notwithstanding that said money or any part thereof should not be so used by the Contractor.

## BOOKS AND RECORDS

**ELEVENTH:** At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.

## DECLINE EXECUTION

**TWELFTH:** Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.

## NOTICE OF EXECUTION

**THIRTEENTH:** The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

## HOMESTEAD

**FOURTEENTH:** The Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Territory, or Possession.

## SETTLEMENTS

**FIFTEENTH:** The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

**SIXTEENTH:** Indemnitors agree that their liability shall be construed as the liability of a compensated Surety, as broadly as the liability of the Surety is construed toward its obligee.

**SEVENTEENTH:** The word Indemnitors, or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require.

## SURETIES

**EIGHTEENTH:** In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

**SUITS**

NINETEENTH: Separate suits may ... brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

**OTHER INDEMNITY**

TWENTIETH: That the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from Indemnitors or others, it being expressly understood and agreed by the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

**INVALIDITY**

TWENTY-FIRST: In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.

**ATTORNEY IN FACT**

TWENTY-SECOND: The Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Indemnitors assigned, transferred and set over to the Surety in this Agreement, and in the name of the Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

**TERMINATION**

TWENTY-THIRD: This Agreement may be terminated by the Indemnitors upon twenty days' written notice sent by registered mail to the Surety at its home office at Westfield Center, Ohio 44251, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been theretofore executed.

TWENTY-FOURTH: This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

TWENTY-FIFTH: THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS—ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE COMPANY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT OR CO-ADVENTURER), FROM TIME TO TIME, AND OVER AN INDEFINITE PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELED IN ACCORDANCE WITH THE TERMS HEREOF.

TWENTY-SIXTH: _____

_____

_____

_____

_____

IN TESTIMONY WHEREOF, the Indemnitors have hereunto set their hands and fixed their seals this __5th__ day of ____March____, 19 __90__.

**Corporate Indemnitors**

Marcelli Construction Co., Inc.
(Full Name and Address of Corporate Indemnitor)

by _Tony Marcelli_____
   Tony Marcelli, President          (Title)

6020 W. Maple, Suite 508, W. Bloomfield, Michigan  48322
(Full Name and Address of Corporate Indemnitor)

by _____
                                     (Title)

(Full Name and Address of Corporate Indemnitor)

by _____
                                     (Title)

(Full Name and Address of Corporate Indemnitor)

by _____
                                     (Title)

_____
(Full Name and Address of Corporate Indemnitor)

by _____
(Title)

_____
(Full Name and Address of Corporate Indemnitor)

by _____
(Title)

**Individual Indemnitors**

Tony Marcelli
6720 Orinoco Circle,Birmingham, MI  48010
(Full Name and Address of Individual Indemnitor)

by _Tony Marcelli_____
Tony Marcelli, Individually

_____
(Full Name and Address of Individual Indemnitor)

by _Cynthia Marcelli_____
Cynthia Marcelli
6720 Orinoco Circle,Birmingham, MI  48010
(Full Name and Address of Individual Indemnitor)

by _Tony Marcelli_____
Tony Marcelli, Individually

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

_____
(Full Name and Address of Individual Indemnitor)

by _____

**Partnership Indemnitors**

_____
(Full Name and Address of Partnership Indemnitor)

by _____

_____

_____
(Full Name and Address of Partnership Indemnitor)

by _____

_____

IMPORTANT: ALL SIGNATURES MUST BE ACKNOWLEDGED ON THE ATTACHED FORM(S).

edgements are intended to acknowledge the Indemnitors' signatures appearing on the attached Agreement of ... s Insurance Co./Westfield Insurance Co. Form BO 5079 dated ___5th___ day of ___March___ , 19 __90__ .

INDIVIDUAL ACKNOWLEDGMENT

Michigan _____ ss:
Oakland _____
n the ___5th___ day of ___March_____ , 19 __90__ , before me personally came
. Tony Narcelli _____

ng known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed
e same.

*Maria Masecar*
Notary Public

MARIA MASECAR
Notary Public, Oakland County, MI
My Comm. Expires Dec. 14, 1992

INDIVIDUAL ACKNOWLEDGMENT

ate of ___Michigan_____ ss:
ounty of ___Oakland_____
On the ___5th___ day of ___March____ , 19 __90__ , before me personally came
Cynthia Narcelli _____

me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed
e same.

*Maria Masecar*
Notary Public

MARIA MASECAR
Notary Public, Oakland County, MI
My Comm. Expires Dec. 14, 1992

INDIVIDUAL ACKNOWLEDGMENT

ate of _____ ss:
ounty of _____
On the _____ day of _____ , 19 ____ , before me personally came
_____

me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed
r same.

Notary Public

INDIVIDUAL ACKNOWLEDGMENT

ate of _____ ss:
unty of _____
On the _____ day of _____ , 19 ____ , before me personally came
_____

he known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed
came.

Notary Public

INDIVIDUAL ACKNOWLEDGMENT

e of _____ ss:
nty of _____
On the _____ day of _____ , 19 ____ , before me personally came
_____

e known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed
same.

Notary Public